**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**

**v.**

**REGINALD DOUGLAS, JR.,**

**Defendant.**

**Crim. Action No. 10-171-4 (JDB)**

---

**MEMORANDUM OPINION**

Defendant Reginald Douglas, Jr. moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) in light of the COVID-19 pandemic and the unusual circumstances of his guilty plea.  He asks the Court to reduce his sentence to time served, imposing any conditions the Court deems necessary for public safety.  See Emergency Mot. for Compassionate Release ("Def.'s Mot.") [ECF No. 358] at 2.  Douglas is a fifty-year-old African-American man currently incarcerated at Ray Brook Federal Correctional Institution ("FCI Ray Brook"), a medium-security facility in Ray Brook, New York.  See id. at 1–2, 31.  The history of this case will be detailed further below, but in short: Douglas has served almost fifty months of a 120-month sentence for second-degree murder in connection with the 1990 killing of Anthony Morrisey, imposed in 2012 to run consecutive to a state sentence he was then serving in New York for a different homicide offense.  Judgment [ECF No. 253] at 2.[1]  He has been incarcerated continuously for twenty-eight years since January 1993.  His current projected release date is in February 2026, and he is

---

[1] The Court notes an apparent error—overlooked by both parties—in the Bureau of Prisons ("BOP") Sentence Monitoring Computation Data sheet attached as Exhibit 1 to the government's opposition.  The data sheet indicates that no time was credited prior to Douglas's New York parole date of August 10, 2017, see Gov't's Opp'n to Def.'s Emergency Mot. for Compassionate Release ("Gov't's Opp'n") Ex. 1 [ECF No. 362-1] at 2, but this Court's judgment recommended that BOP give Douglas  "appropriate credit for time served," specifically the eight months and nine days he served from 1990–91 "on the original D.C. Superior Court charges relating to this offense," Judgment at 2.  Taking that time into account now, Douglas has actually served over forty-nine months of his sentence, not forty-one months as the briefs suggest.

1

projected to become eligible for home detention in August 2025.  Gov't's Opp'n Ex. 1 at 1–2. But if and when BOP were to credit Douglas for the eight months he served from 1990–91, see Judgment at 2, those dates would presumably move to June 2025 and December 2024, respectively.

Now, however, Douglas argues that his medical conditions, including Stage 2 uncontrolled hypertension, increase his risk of severe illness or death if he were to contract COVID-19, constituting "extraordinary and compelling reasons" that warrant his immediate release.  Def.'s Mot. at 1, 14–15.  He argues that the "irregularities in his underlying conviction" provide separate grounds for his release amidst the pandemic.[2]  Id. at 15.  The government opposes the motion, arguing that (1) Douglas has not established any "extraordinary and compelling reasons" for release under § 3582(c); (2) Douglas remains a danger to the community; and (3) the relevant § 3553(a) factors weigh against release.  See Gov't's Opp'n [ECF No. 362] at 2.  For the reasons explained below, the Court finds that Douglas's health risks do present extraordinary and compelling reasons for release and that the balance of factors under 18 U.S.C. § 3553(a) supports granting his motion.

## **Background**

This case is marked by an unusual and convoluted history dating back several decades. Many of the tragic outcomes of this case fall squarely on Douglas's shoulders, and his responsibility in the cruel and senseless murder of Mr. Morrisey cannot be overstated.  But other circumstances outside of Douglas's control bear mention here as well.

Reginald Douglas was born in 1970 in Harlem to a fifteen-year-old mother and sixteen-

---

[2] Douglas previously filed a motion for compassionate release on September 3, 2020.  See Emergency Mot. for Compassionate Release (Sept. 3, 2020) [ECF No. 345] ("Sept. Mot.").  Because he did not demonstrate that he had exhausted administrative remedies, as required by § 3582(c)(1)(A), the Court denied that motion without prejudice.  See Mem. Op. & Order (Sept. 30, 2020) [ECF No. 356] at 4–5.

year-old father with family ties to the brutally violent drug trade then endemic to the neighborhood. See Presentence Investigation Report ("PSIR") [ECF No. 246] ¶¶ 35, 37; Def.'s Mot. at 3–4. According to statements submitted by Douglas and his mother, Douglas's childhood was highly traumatic: he recalls "witnessing drug addicts overdosing" and ducking bullets "as a man was being murdered mere feet away" from him and his mother.  See Sept. Mot. Ex. B [ECF No. 345-2] at 2; .  When Douglas was just five years old, his father was shot and killed.  PSIR at 12.  This caused a change in his behavior, which led his mother to take him to a psychiatrist who "revealed that Reginald was suffering from trauma from his father's death."  See Sept. Mot. Ex. E [ECF No. 345-5] at 2.  But Douglas never received any psychological treatment for his trauma and he soon became involved in the drug trade at just eleven years old.  PSIR ¶¶ 40, 48.  His young mother attempted to deal with Douglas's worsening behavioral problems by moving him out of New York, first to Nevada and later to Virginia Beach after she remarried, but he frequently made his way back to the streets of Harlem.  Id. ¶ 39; Sept. Mot. Ex. E at 2.  After attending middle school in Virginia Beach for three years, Douglas dropped out of school before completing the seventh grade.  PSIR ¶ 53.  Eventually, his stepfather brought the teenaged Douglas to Washington, D.C. and "exposed him" to a "violent environment" in what was then "the murder capital of the Nation." See Sept. Mot. Ex. E at 4.  In his late teenage years, Douglas was arrested on multiple occasions in the D.C. area and accrued two convictions on weapons charges in Maryland, plus an assault conviction in New York, prior to the instant offense.  PSIR ¶¶ 24–34.

On July 12, 1990, when Douglas was nineteen years old, he and co-defendant David Long kidnapped Anthony Morrisey, a twenty-year-old drug courier whom Douglas, Long, and their associates believed to have large amounts of drugs and cash.  See id. ¶¶ 12–14; Gov't's Opp'n to Defs.' Mots. to Sever ("Opp'n to Severance") [ECF No. 59] at 2.  They held Morrisey at gunpoint

and demanded a cash ransom from Morrisey's friends and parents.  See PSIR ¶ 13.  When Douglas

and Long "learned that the police were in the area," they "walked Mr. Morrisey . . . toward the

alley in the rear of the house" where they were holding him and "[w]ith David Long standing

nearby, [Douglas] shot Mr. Morrisey in the head at least two times."  Factual Proffer [ECF No.

212] at 1–2.  Mr. Morrisey was shot a total of four times by Douglas and Long and died from his

wounds.  Id. at 1.

Douglas was arrested on August 2, 1990 and was held without bond in the D.C. jail pending

trial.  See Mem. Op. & Order (Feb. 8, 2012) ("Dismissal Order") [ECF No. 113] at 2.   An

indictment against Douglas for the Morrisey murder was handed down in March 1991, which was

superseded in April 1991 by an indictment naming five defendants.  Mem. Op. & Order (Mar. 13,

2012) ("Reconsideration Order") [ECF No. 130] at 2.  The co-defendants' trials were severed on

the day set for the initial trial, and the government chose to try two of the co-defendants first in

hopes of securing their cooperation against Douglas and the other co-defendants.  Dismissal Order

at 3.  Douglas's trial was ultimately rescheduled for January 29, 1992, then continued until March

2 due to the prosecutor's involvement in another trial.  Id.  When the government requested another

two weeks to locate witnesses, the trial judge denied the request and dismissed the case for want

of prosecution on March 5, 1992.  Id.  Douglas was then transferred on a detainer to Prince

George's County, Maryland, where he remained incarcerated on gun charges for which he was

sentenced to time served on July 7, 1992.  See Def.'s Mot. at 5; PSIR ¶ 26.

Upon his release, Douglas returned to New York City where, just months later in January

1993, he committed another shooting homicide for which he was convicted and sentenced to

twenty-five years to life.  PSIR ¶ 27.  While Douglas was incarcerated in New York for that

offense, in June 2010 the government indicted David Long, along with two other men not involved

in the Morrisey murder, for a drug distribution conspiracy including several violent crimes (the "Long conspiracy"). See Dismissal Order at 3. In the course of investigating that conspiracy, the government realized that Douglas, Long, and another of the original co-defendants in the Morrisey murder—since deceased—were never brought to trial for the 1990 offense. Id. at 3–4. On April 5, 2011, the government filed a superseding indictment in the Long conspiracy case naming Douglas as a defendant and charging him and Long with the Morrisey murder as well as conspiracy to distribute and possess with intent to distribute narcotics. See Superseding Indictment [ECF No. 33] at 2, 6.

This Court dismissed the murder charges against Douglas on February 8, 2012 on Sixth Amendment speedy trial grounds. See Dismissal Order at 1. But after the government "laid out substantially more information on the factual background of this case and a lengthier legal argument" on the speedy trial issues underlying the dismissal, the Court reinstated the charges. See Reconsideration Order at 1, 10. On April 30, 2012, a superseding information was filed against Douglas alone for a drug conspiracy and the Morrisey murder, see Superseding Information [ECF No. 150], and on July 10, 2012, Douglas pled guilty to second-degree murder while armed in violation of D.C. Code §§ 22-2103 & 4502, see Plea Agreement [ECF No. 213] ¶ 1. The government dismissed the drug conspiracy count. Id. ¶ 3. Pursuant to the plea agreement, this Court sentenced Douglas to 360 months' imprisonment, with all but 120 months suspended, to run consecutive to his New York sentence, followed by 60 months' probation. See Judgment at 2–3; Plea Agreement ¶ 3. The Court recommended that BOP credit Douglas for eight months and nine days of time served while Douglas was incarcerated pending trial in D.C. Superior Court during 1990–91, though, as noted above, it appears BOP has not done so. Compare id. at 2, with Gov't's Opp'n Ex. 1 at 2. His federal sentence began to run when he was granted parole by the New York

State Parole Board on August 10, 2017.  See Def.'s Mot. at 31; Gov't's Opp'n Ex. 1 at 2.

## Legal Framework

Under the First Step Act of 2018, a court may, upon motion of the BOP or a defendant, reduce a defendant's term of imprisonment if, "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable,"  it concludes that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  The applicable policy statements require, inter alia, that the defendant's release not pose "a danger to the safety of any other person or to the community."  See U.S.S.G. § 1B1.13.  "As the moving party, the defendant bears the burden of establishing that he is eligible for a sentence reduction under § 3582(c)(1)(A)."  United States v. Demirtas, Crim. A. No. 11-356 (RDM), 2020 WL 3489475, at *1 (D.D.C. June 25, 2020).  And a court may consider a defendant's motion for such a reduction only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring [such] a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

## Analysis

As a threshold matter, Douglas asserts, and the government concedes, that he has now satisfied the statutory exhaustion requirement.  See Def.'s Mot. at 13–14; Gov't's Opp'n at 16–17.  Hence, the Court will proceed to the merits of Douglas's motion.  First, the Court will examine whether he has identified "extraordinary and compelling reasons" for his release, and if so, whether his release would pose a danger to community safety.  Then, the Court will consider whether a reduction of sentence to time served is otherwise consistent with the applicable § 3553(a) factors.

## I.     Extraordinary and Compelling Circumstances

Douglas alleges two sets of "extraordinary and compelling reasons" to justify his release: (1) his high susceptibility to serious illness or death from COVID-19 due to his medical conditions—uncontrolled Stage 2 hypertension, left ventricular hypertrophy ("LVH"), pre-diabetes, and childhood asthma—amidst the ongoing outbreak of COVID-19 at FCI Ray Brook; and (2) the unusual circumstances of his prosecution and plea in this case. See Def.'s Mot. at 14–15.

Although the Court will consider the circumstances of Douglas's prosecution and plea when analyzing the § 3553(a) sentencing factors, those circumstances are not "extraordinary and compelling" for the purposes of § 3582(c)(1)(A). The Court was aware of this case's unusual procedural history at the time it accepted the plea agreement and imposed sentence. See Tr. of Sentencing Hr'g [ECF No. 319] at 14–17. It would be illogical to find that circumstances already considered at the time of sentencing now justify a sentence reduction absent any new factual developments or discoveries. See United States v. Williams, No. 4:15-CR-00037-1BR, 2019 WL 6529305, at *1 (E.D.N.C. Dec. 4, 2019) ("The arguments defendant makes relate to validity of her conviction and sentence. Motions for a sentence reduction under § 3582(c)(1)(A) are not substitutes for direct appeal or habeas corpus motions."). The Court will thus focus on whether Douglas's medical conditions and resultant vulnerability to COVID-19 are extraordinary and compelling circumstances justifying release.

At the outset, the parties disagree over the weight that the Court must afford to the Sentencing Commission's policy statement defining "extraordinary and compelling" medical conditions. The government argues that the Sentencing Commission's policy statement on reduction of sentences under § 3582(c)(1)(A) requires Douglas to demonstrate that his medical

condition "substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility" and that he "is not expected to recover" therefrom.  See Gov't Opp'n at 14–15, 20–21 (quoting U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I)).  Douglas argues that because U.S.S.G. § 1B1.13 has not been modified since the passage of the First Step Act, its definition of extraordinary and compelling medical conditions does not constrain courts entertaining compassionate release motions brought by defendants.  See Def.'s Mot. at 27–28 (citing, inter alia, United States v. Gunn, 980 F.3d 1178, 1181 (7th Cir. 2020)).

Judges in this District have split on the question, and the D.C. Circuit has yet to weigh in. Compare United States v. Goldberg, Crim. A. No. 12-180, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (Howell, C.J.) ("[G]iven the plain text of § 3582(c)(1)(A), which requires a finding that any sentence reduction is 'consistent with applicable policy statements issued by the Sentencing Commission,' the limitations in U.S.S.G. § 1B1.13 apply and are binding."), with United States v. Price, Crim. No. 07-0152-06, 2020 WL 5909789, at *3 (D.D.C. Oct. 6, 2020) (Huvelle, J.) ("[T]his Court finds the many opinions that endorse an expansive reading of a sentencing court's power, given the changes instituted by the First Step Act and the fact that the policy statement has not been amended since its enactment, to be more persuasive.").  But there is more to the policy statement than just Application Note (1)(A) pertaining to medical conditions: Application Note (1)(D) permits consideration of "[o]ther [r]easons" presenting "an extraordinary and compelling reason other than, or in combination with, the reasons described."  U.S.S.G. § 1B1.13 cmt. n.1(D); see also United States v. McCoy, 981 F.3d 271, 283–84 (4th Cir. 2020) (First Step Act necessarily permits courts to consider Application Note (1)(D)'s catch-all provision notwithstanding its facial applicability to BOP alone).  Multiple judges in this District—including Chief Judge Howell, who applies § 1B1.13 in a binding manner—have found the COVID-19

pandemic to constitute an "other reason" a court may consider that renders an otherwise non-debilitating medical condition an extraordinary and compelling justification for release. See, e.g., United States v. Morris, Crim. No. 12-154, 2020 WL 2735651, at *7 (D.D.C. May 24, 2020) (Howell, C.J.) ("The COVID-19 pandemic presents such an 'other reason,' [under Application Note (1)(D)] given the circumstances in this case."); United States v. Hunter, Crim. No. 11-039, 2020 WL 5748115, at *2 (D.D.C. Sept. 25, 2020) (Friedman, J.) (citing Morris for the same proposition).  Such is the case here as well.[3]

Douglas has submitted evidence that he suffers from hypertension and LVH, is pre-diabetic, and experienced severe asthma as a child.  See generally, e.g., Sept. Mot. Ex. C [ECF No. 345-3]; Sept. Mot. Ex. G [ECF No. 345-7]; Ex. AA [ECF No. 360].  But he has not specifically argued that his pre-diabetes increases his susceptibility to complications from COVID-19, and it does not appear that he continues to suffer from asthma.  Hence, the Court will narrow its focus to Douglas's documented history of hypertension and LVH, which it will consider together for reasons explained below.

Although the CDC lists hypertension among conditions that merely "might" increase an individual's risk of serious COVID-related illness, see Gov't's Opp'n at 19–20, 22–23; People with Certain Medical Conditions, Ctrs. for Disease Control & Prevention (last updated Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, medical studies and statistics cited by Douglas make clear that hypertension is a serious risk factor and cannot be dismissed simply because its causal relationship to COVID-19-

---

[3] Douglas also argues that his condition already rises to the level of substantially diminishing his ability to provide self-care, citing his "difficulty walking the approximately 200 yards from his unit to the food hall and med line," and "several occasions [on which] Mr. Douglas has been too lightheaded to stand for a head count, although it is required."  See Def.'s Mot. at 28.  As discussed here, the severity of his symptoms factor into the Court's analysis of his COVID-related risk of serious illness or death, but he need not show that his hypertension alone is debilitating given the availability of Application Note (1)(D)'s "catch-all" provision.

related illness is less strong than other graver pre-existing conditions.  See, e.g., Vikramaditya Reddy Samala Venkata et al., Abstract P135: Covid-19 And Hypertension: Pooled Analysis of Observational Studies, Hypertension (2020), https://doi.org/10.1161/hyp.76.suppl_1.P135 ("Hypertension by itself was associated with higher rates of mortality [from COVID-19]."); Xuan Liang et al., The Association of Hypertension with the Severity and Mortality of COVID-19 Patients: Evidence Based on Adjusted Effect Estimates, 81 J. Infection (2020) ("[M]eta-analysis showed that hypertension was significantly associated with the increased risk of adverse outcomes in COVID-19 patients on the basis of 19 studies with 15,302 cases.").

Moreover, Douglas's particular case of hypertension is severe: as substantiated by his medical records, he has regularly registered blood pressure levels well in excess of the threshold for Stage 2 hypertension (140+ systolic or 90+ diastolic reading) and has recently experienced other symptoms such as headaches, dizziness, and tightness in his chest.  See, e.g., Sept. Mot. Ex. G at 3, 13; Ex. AA at 3, 6, 26.  Many of his blood pressure readings meet the American Heart Association's standards for "hypertensive crisis" (180+ systolic or 120+ diastolic reading) requiring immediate emergency medical attention.  See Reply to Gov't's Opp'n to Def.'s Emergency Mot. for Compassionate Release ("Def.'s Reply") Ex. GG [ECF No. 363-1] at 2–5 (describing at least five crisis-level blood pressure readings in November and December 2020); Am. Heart Ass'n, The Facts About High Blood Pressure, https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure (last visited Jan. 20, 2021).  The persistence of his high blood pressure readings over time, as well as the prevalence of symptoms like "intense headaches, tightness in the chest, heart palpitations, dizziness, and exhaustion from walking short distances, standing, or climbing stairs," indicate that his trajectory is materially worsening.  See Def.'s Reply [ECF No. 363] at 6; Def.'s Reply Ex. GG at 1–5.  Moreover, although

LVH does not appear on the CDC's list of conditions increasing the risk of serious COVID-related illness, it does appear to compound the severity of his hypertension, and the Court thus considers Douglas's LVH as yet further exacerbating the risk potential posed by his hypertension.  See Richard E. Katholi & Daniel M. Couri, Left Ventricular Hypertrophy: Major Risk Factor in Patients with Hypertension: Update and Practical Clinical Applications, Int'l J. Hypertension (2011), https://doi.org/10.4061/2011/495349 (last visited Jan. 20, 2021) ("[LVH] patients' risk of cardiovascular morbidity and mortality is two-to-four-fold increased compared to patients with normal left ventricular mass.").

The Court is not persuaded that "BOP is closely monitoring and treating the defendant's condition," see Gov't's Opp'n at 21, to such an extent as to allay concerns over his vulnerability to COVID-19.  As detailed in Douglas's reply, BOP medical staff have failed to implement the October 14, 2020 recommendations of Douglas's outside cardiologist, Dr. Tramontano.  See Def.'s Reply at 5 (stating, inter alia, that BOP had altered the recommended dosage and timing of Douglas's medications against his cardiologist's directions, and failed to monitor Douglas's blood pressure on a daily basis as ordered by his cardiologist (citing Ex. AA)).  And indeed, Lisinopril, one of the medications Douglas is taking for his hypertension, see Def.'s Reply Ex. GG at 2, 4, may even increase his risk of becoming infected with COVID-19 in the first place, see United States v. Salvagno, 456 F. Supp. 3d 420, 428 (N.D.N.Y. 2020) ("Defendant faces a heightened risk of developing severe symptoms once infected, due to his hypertension, and may even face a heightened risk of contracting COVID-19 in the first place, due [to] his treatment with Lisinopril."); United States v. Roman, Crim. No. 19-116 (KMW), 2020 WL 1908665, at *2 (S.D.N.Y. Mar. 27, 2020) ("[T]he fact that he takes Lisinopril, an ACE inhibitor, to treat his hypertension likely places him 'at higher risk for severe COVID-19 infection.'" (quoting Lei Fang

et al., Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?, The Lancet (2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-26002030116-8/fulltext)).

This evidence distinguishes Douglas's case from others where courts—including this one—have denied relief to individuals with controlled or benign hypertension. See, e.g., United States v. Johnson, Crim. No. 02-310 (JDB), 2020 WL 5518360, at *3 (D.D.C. Sept. 12, 2020) (denying relief where hypertension was "well managed" and defendant had "no complaints"); United States v. Wilson, No. 2:18-cr-00132-RAJ, 2020 WL 4901714, at *4–5 (W.D. Wash. Aug. 20, 2020) (denying relief where defendant only expressed "at-times elevated blood pressure" and "was able to recover from COVID-19 without hospitalization"); United States v. Gray, No. 14 CR 810-10 (CM), 2020 WL 3050730, at *3 (S.D.N.Y. June 8, 2020) (denying relief where hypertension was "benign"). Conversely, courts assessing diagnosed hypertension in men like Douglas, with other risk factors correlated to age, race, and sex, have found the associated "risk of becoming seriously ill or dying from COVID-19 while incarcerated . . . itself an extraordinary and compelling reason to warrant a sentence reduction." See, e.g., United States v. Mason, 471 F. Supp. 3d 225, 227 (D.D.C. 2020).

Compounding the severity of the circumstances in Douglas's case, the prevalence of COVID-19 at FCI Ray Brook has increased dramatically during briefing on the present motion. When the government filed its opposition on December 23, 2020, there were seventeen confirmed positive COVID-19 cases among inmates and none among staff. See Gov't's Opp'n at 7. Douglas submitted evidence that the BOP numbers may have been understated due to insufficient testing and ineffective containment measures, see Def.'s Mot. Ex. CC [ECF No. 358-3] at 2–5, and in any event the official tally rose to thirty-eight by the time Douglas filed his reply on December 31,

2020.  See Def.'s Reply at 8.  Just a week later, local news reported an outbreak at FCI Ray Brook, recording seventy-nine new cases over the preceding week and a total of 130 cases at the prison. See  A  Look  at  COVID-19  Cases  in  Our  Region,  WCAX  (Jan.  8,  2021), https://www.wcax.com/2021/01/08/a-look-at-covid-19-cases-in-our-regions-prisons/.  BOP numbers have been updated at the time of this writing to indicate ninety-six total confirmed active cases.  See BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/index.jsp (last visited Jan. 20, 2021).[4]  But according to the Correctional Officers Union at FCI Ray Brook, "testing is still rare" as of January 19: "[s]taff members have to seek tests themselves if they are concerned about exposure," and "inmates are generally not tested until they begin experiencing COVID-19 symptoms," leaving some uncertainty about the full scope of the outbreak.  See Aaron Cerbone, Union: Prison Apathetic About COVID, Adirondack Daily Enterp. (Jan. 19, 2021), https://www.adirondackdailyenterprise.com/news/local-news/2021/01/union-prison-apathetic-about-covid/.  As multiple courts have recognized, quoting a statement from Professor Leonard Rubenstein of Johns Hopkins' Bloomberg School of Public Health, "[i]f you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on . . . .  It's too late."  Salvagno, 456 F. Supp. 3d at 449 (quoting United States v. Pabon, 458 F. Supp. 3d 296, 304 (E.D. Pa. 2020)).

Where facilities are "facing severe COVID-19 outbreaks," "hypertension alone, or in combination  with  other  non-aggravating  health  conditions,"  has  been  found  to  constitute extraordinary and compelling circumstances justifying release.  Johnson, 2020 WL 5518360, at *3

---

[4] On January 20, 2021, Douglas submitted copies of letters he had written to family members detailing his experience of the outbreak, noting, inter alia, that 49 of the new COVID-19 cases in the prison were recorded among men housed in the same unit as him, and that inmates are being returned to the unit after ten to fourteen days' isolation without re-testing.  Notice of Suppl. Authority Ex. A [ECF No. 364-1] at 4.  He also reported another crisis-level blood pressure reading on January 6 of 196/102.  Id. at 2.

(citing <u>United States v. Sawicz</u>, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020)); <u>see also</u> <u>Salvagno</u>, 456 F. Supp. 3d at 456 (collecting "at least nine cases [as of June 22, 2020] in which courts have released inmates with hypertension and no other recognized risk factors or conditions known to be significant comorbidities," usually where "the inmate was housed in an unusually high-risk facility"); <u>United States v. Robinson</u>, Case No. 3:10cr261, 2020 WL 4041436, at *5 (E.D. Va. July 17, 2020) (relying on <u>Salvagno</u>'s "thorough[] evaluat[ion of] the relationship between hypertension as a risk factor and COVID-19" to hold defendant's "hypertension, combined with the conditions at FCI Fort Dix"—where only forty-four cases were then active—"adequately presents extraordinary and compelling reasons for compassionate release").

As several courts have recognized, "[i]t can be hardly disputed that the novel strain of the coronavirus that causes COVID-19 is much more easily transmitted in the prison environment," pressing the need for relief further still.  <u>Morris</u>, 2020 WL 2735651, at *7 (quoting <u>United States v. Johnson</u>, 464 F. Supp. 3d 22, 37 (D.D.C. 2020)).  Accordingly, the Court finds that Douglas's uncontrolled hypertension and LVH, insufficient treatment, and the virulent prevalence of COVID-19 at FCI Ray Brook, together present an extraordinary and compelling reason for release.

## II.      Future Dangerousness

Having found an extraordinary and compelling justification to release Douglas, the Court next must ensure that a sentence reduction is, <u>inter alia</u>, consistent with the Sentencing Commission's policy statement requiring that "defendant is not a danger to the safety of any other person or to the community."  <u>See</u> U.S.S.G. § 1B1.13(2).  On this score, the government contends that Douglas remains a danger to society, citing certain facts proffered at the time of his indictment and plea in 2012.  Douglas points to his exemplary prison disciplinary record and successful completion of countless prison rehabilitative programs, and asserts that his age and support

network further reduce any likelihood that he might reoffend.

The Court disagrees with the government's allegation that Douglas continues to pose a danger to the community. Without question, the kidnapping and murder of Anthony Morrisey was a horrific offense against the victim, his family, and the community at large. Douglas admits as much and has taken responsibility and exhibited remorse for his callous actions as a nineteen-year old. See Def.'s Mot. at 32; Sept. Mot. Ex. B at 3–4; Gov't's Opp'n Ex. 2 [ECF No. 362-3] at 13–14. The nature of that offense poses a significant obstacle to Douglas's release even now. And when the initial case against Douglas was dismissed in 1992 and he was released, Douglas unquestionably did pose a real threat to public safety. He had entered the drug trade in early adolescence and dropped out of school before completing the seventh grade. See PSIR ¶¶ 40, 53. The threat he posed as a young man released from confinement due to prosecutorial mishandling bore out when he took the life of another young man in New York City. That life may have been saved if the government and the D.C. Superior Court had taken stock of just how serious a danger to public safety Douglas posed at that time.

But this Court cannot undo the past and is instead tasked with assessing Douglas's current dangerousness. In doing so, it must look beyond the underlying offense to his conduct while incarcerated. See Pepper v. United States, 562 U.S. 476, 492 (2011) (Under § 3553(a), "postsentencing conduct . . . sheds light on the likelihood that [defendant] will engage in future criminal conduct."); see also Brown v. United States, Crim. A. No. ELH-00-0100, 2020 WL 7425328, at *17 (D. Md. Dec. 17, 2020) (Defendant's "behavior for the past 20 years, while in BOP custody, is an important indicator of whether he remains a danger to the community."). Defendants who provide compelling evidence of their rehabilitation have been granted compassionate release notwithstanding gruesome offenses committed decades past. See, e.g.,

Hunter, 2020 WL 5748115, at *3–4 (granting compassionate release and citing defendant's "correctional treatment, and community engagement" notwithstanding his "serious and disturbing" prior criminal history including second-degree murder, armed robbery, setting fire to his then-girlfriend's home with her and a minor child inside, and a prison disciplinary record "including violent altercations with other prisoners"); United States v. Fisher, 1:83-cr-00150-PAC-1, — F. Supp. 3d —, 2020 WL 5992340, at *6 (S.D.N.Y. Oct. 9, 2020) (releasing defendant sentenced to life without parole for large conspiracy including at least four murders defendant was alleged—albeit not specifically proven—to have committed himself after he had served thirty-eight years because his "considerable and sustained efforts to rehabilitate himself bespeak a changed man" who no longer poses a danger); United States v. Rodriguez, 00 Cr. 761-2 (JSR), — F. Supp. 3d —, 2020 WL 5810161, at *6 (S.D.N.Y. Sept. 30, 2020) (finding that defendant who tortured a government informant to death does not pose a continuing danger in light of "outstanding long-term prison record, lack of any significant disciplinary history, and the numerous letters of support submitted by prison staff, family, and friends, all attesting to [defendant's] reformation"); United States v. Torres, 464 F. Supp. 3d 651, 659 (S.D.N.Y. 2020) (reducing two defendants' life without parole sentences for serving as kingpins in large-scale heroin conspiracy to time served citing "[t]heir remarkable postsentencing rehabilitation").

The evidence here demonstrates that Douglas too has undergone a remarkable transformation over the course of his incarceration. He earned his G.E.D. in 2002 and has completed thousands of additional hours of educational, vocational, and therapeutic programming, much of which has focused on taking responsibility for his past actions and developing skills in nonviolent conflict resolution. See generally Sept. Mot. Ex. H [ECF No. 345-8]. Program staff characterize Douglas as an active participant in programming, both in the New York State

correctional system, see id. at 16–17 (describing Douglas as "very helpful with peers," "very dynamic and insightful," and noting he "would make an excellent facilitator"), and at FCI Ray Brook, see id. at 3 ("Inmate Douglas was an active participant in every class [of a 100-hour reentry program] and spoke honestly during group sessions."). For instance, the executive director of Hudson Link for Higher Education in Prison wrote that, "[u]sing the same determination and steadfastness he has exhibited in our program, [Douglas] will truly be a force for change to his family first and his community next." Sept. Mot. Ex. E at 14. T. Breeyear, an education specialist at FCI Ray Brook who "see[s] Mr. Douglas almost daily in the Education department," commends Douglas's attitude and work ethic, noting that Douglas regularly "mentor[s] younger inmates and assist[s] staff." Def.'s Mot. Ex. FF [ECF No. 358-5] at 3. And Douglas's case manager at FCI Ray Brook, James Weldon, submitted a highly laudatory letter on Douglas's behalf, attesting that he "ha[s] seen [Douglas] avoid confrontations with other inmates as well as mediate between others who may be in conflict." Id. at 2. He describes Douglas as "a role model for younger inmates" and as someone who "maintain[s] the trust of the staff that oversee him." Id. Likewise, Douglas's BOP Reentry Plan Progress Report states that "[h]e was vital in encouraging younger inmates to enroll in [the reentry] program and share their experiences and concerns during class discussions." Sept. Mot. Ex. G. at 3. Courts have found letters from prison staff—"written by the unbiased people who have spent more time with [defendant] than anyone else—to be powerful evidence of his rehabilitation." See Rodriguez, 2020 WL 5810161, at *4.

Douglas's profound commitment to mentorship is further substantiated by the many letters from his mentees and program staff describing the positive influence he has exerted over their lives while incarcerated. See Sept. Mot. Ex. E at 11–13, 18, 25–36. One mentee describes Douglas "like a nagging uncle" pushing him to better himself by continuously reminding him of his

responsibilities to his young daughter, escorting him to drug rehabilitation class every day, and encouraging him to enroll in reentry programming.  See id. at 25–26.  Another noted how Douglas "pours manners, morals, history, knowledge, and love into the younger generation so they can not only be better, but in hopes they'll pass these same virtues into the generation after them."  Id. at 27.  At FCI Ray Brook, Douglas and other "elders" set up an informal table in a common area where younger inmates gathered to learn life lessons from the older men.  Id. at 28–29.  Through this spontaneous mentorship, Douglas helped a self-described "active gang member" with "a chip on [his] shoulder" break his gang affiliation and pursue an education.  Id.  Another mentee of Douglas's wrote a letter of support while awaiting "imminent release" recounting Douglas's role in pushing him to obtain an associate degree and pursue a bachelor's degree.  Id. at 34.  He too described Douglas's positive example as infectious: "[Douglas's] investing in me and encouraging me to educate myself and grow necessitates me to do the same for someone else."  Id.  Douglas's efforts to pass on the lessons from his own rehabilitative evolution evince the exceptional degree to which he has moved beyond the antisocial attitudes he held as a violent young man.

Douglas's prison disciplinary record also demonstrates his rehabilitation, and further allays any concerns of potential future dangerousness.  He admits to a "write-up" for "possessing an illegal cooking utensil in 2008," but there is no other record of disciplinary infractions before the Court that might imply a continued danger to the community.  See Def.'s Mot. at 10.  The New York State Parole Board had access to Douglas's entire file from that state's prison system when it investigated his case in 2017, and yet the examining commissioners did not mention a single disciplinary incident in their interview of Douglas after which he was granted parole.  See Sept. Mot. Ex. A [ECF No. 345-1].  Indeed, the commissioners noted that the risk assessment tool employed by New York, COMPAS, "indicates a low risk of felony violence, arrest and

absconding" and was "low, overall."  See id. at 12.  For its part, BOP classified Douglas as "Low" risk as well, leading the Warden of FCI Ray Brook to order him transferred to a low security institution "[d]ue to his positive institutional adjustment, [and] lack of discipline history."  Sept. Mot. Ex. I [ECF No. 345-9] at 2–3.[5]   That clean disciplinary record is over decades of incarceration.

Douglas submitted evidence of his strong family ties and opportunities for housing and employment upon release to further support his contention that he is poised to reenter the community safely and successfully.  See Sept. Mot. Ex. E.  While incarcerated, Douglas has maintained close relationships with his mother, stepfather and stepsiblings, several of whom have written letters detailing his role in their lives over the years.  See Sept. Mot. Ex. E at 2–6, 22–24. He also reconnected with Taikecha Wade in 2018, with whom he fathered a son before his incarceration.  See id. at 9.  Impressed with Douglas's transformation, Ms. Wade introduced Douglas to their son Anton, who has since developed a close bond with Douglas.  Id. at 8–10.  Ms. Wade has now offered to take Douglas into her home and secure employment for him in her family-owned trucking business.  Id. at 10.  In preparation for reentry, Douglas "completed a 100-hour Reentry Program . . . that consists of 10 individual courses" including Employment Skills, Job Placement Assistance, Problem Solving & Decision Making, Money Management Skills, and more.  See Sept. Mot. Ex. H at 2–3.

The availability of economic and emotional support further mitigates any risk that Douglas might revert to his old ways and pose a danger to society.  See, e.g., United States v. Danson, Crim. No. 10-51 (PLF), 2020 WL 3467887, at *5 (D.D.C. June 25, 2020) (granting release where

---

[5] As Douglas notes in his motion, he was not ultimately transferred due to the BOP-wide moratorium on all prison transfers during the COVID-19 pandemic.  Def.'s Mot. at 34.

"[f]amily support and gainful employment thus have the potential to provide Mr. Danson with a powerful support system, which one hopes will aid him in readjusting to life outside of prison and help prevent recidivism"); United States v. Parker, 461 F. Supp. 3d 966, 983  (C.D. Cal. 2020) (granting weight to defendant's "numerous family ties, including family members who will provide for him" (citation omitted)).  And at age fifty, moreover, Douglas is statistically less likely to reoffend than a younger person would be upon release.  See Kim Steven Hunt et al., The Effects of Aging on Recidivism Among Federal Offenders, U.S. Sentencing Comm'n, at 3 (Dec. 2017).

The government questions the authenticity of Douglas's apparent rehabilitation, noting that he was also charged "with a narcotics conspiracy beginning in 1990 and extending through March, 2008" in the initial indictment handed down against him in 2011.  Gov't Opp'n at 25 (emphasis in original).  While certainly worthy of the Court's scrutiny, this unconvicted charge does not in itself indicate future dangerousness when viewed in the context of Douglas's entire record.  As the government acknowledges, the conspiracy charge against Douglas was dropped pursuant to his plea agreement and was thus not subjected to the rigors of the adversarial factfinding process.  Id. The PSIR states that "Douglas's involvement in the conspiracy is limited to 1990, as he was incarcerated almost continuously from August 1990 to the present," PSIR at 6–7, and there is no evidence that Douglas was ever disciplined or even investigated by prison authorities for taking part in any outside criminal activity or has otherwise displayed any violent or antisocial tendencies. Indeed, Mr. Weldon, who interacts with Douglas as well as hundreds of other inmates on a daily basis, wrote that "Mr. Douglas displays no signs of aggression or violence."  Def.'s Mot. Ex. FF at 2.

The only concrete evidence the government cites to support its allegations that Douglas engaged in criminal activity while incarcerated is a 2006 letter Douglas purportedly sent to his co-

defendant David Long that allegedly contained a photograph of Emanuel Parnell Grady (aka "P"), who had been an acquaintance of Long's and Douglas's, with another man, "Al."  Gov't's Opp'n at 25–26 & n.23.[6]   Grady had been murdered five months before the letter was sent, and Long was alleged to be involved.  Id.  The government also states that Long visited Douglas a month before Grady's murder.  Id.  The government did not allege any other contacts between Douglas and Long since 1990, it has not submitted a copy of the 2006 letter, and the record contains no evidence beyond the fact of Long's continuous criminality that the alleged Douglas-Long visit was nefarious.  Indeed, other pretrial briefs submitted by the government in this case stated that Grady also visited Douglas in prison and spoke with Douglas on the telephone.  See Opp'n to Severance at 3.  It is thus not implausible, in the absence of any other contextual evidence, that Douglas was caught in the middle of the conflict between Long and Grady.  The government's claim that Douglas's letter was intended to "identify[] associates of Grady whom Long might want to kill," Gov't's Opp'n at 25, is speculative at best.  Indeed, the language from the letter quoted below in footnote 5 is more easily read to suggest that Long was in danger from Grady's associates, as the government acknowledges.  See id. (suggesting, alternatively, that the letter "indentif[ied] associates of Grady . . . whom Long should be wary of following Grady's murder").  Although Douglas's 2006 letter may have been enough for this Court to deny Douglas's motion to dismiss the conspiracy count, see Mem. Op. & Order (Feb. 9, 2012) [ECF No. 116] at 3, it does not come close to outweighing the voluminous evidence of Douglas's rehabilitation and does not by itself portend any future dangerousness.

    To be sure, Douglas's case for compassionate release is easily distinguishable from Long's,

---

[6] The quoted portion of the letter reads, in relevant part, "This is just the flick of [the decedent].  (R.I.P.) and these dudes that was in with him, I think the dude with the headband on is 'Al.'  That's what it says on the back of the joint. . . . [S]tudy [the picture of Al], keep his face in your head, [and] always stay 1,000 steps ahead of the streets and everybody and everything in them."  Gov't's Opp'n at 25–26 n.23.

whose motion this Court denied on September 25, 2020 given the conclusion that Long continued to pose a danger to the community.  See Order (Sept. 25, 2020) [ECF No. 353].  Unlike Douglas, whose criminal activity ceased with his incarceration at age 22, Long's "criminal history . . . continued well into his adulthood," including—after the Morrisey murder—paying accomplices to murder three other men in 2007, and conspiring to distribute "at least 15 kilograms of heroin." Id. at 2–3.  Moreover, BOP "concluded that Long poses a high risk of recidivism."  Id. at 3 (emphasis added).  And Long's evidence of rehabilitation during his approximately twelve years in prison consisted of participation in just twelve education courses and an absence of infractions. Id.  Other than that, he "offer[ed] very little to rebut [the] evidence of his continued dangerousness."  Id.  As discussed at length above, the record before the Court on Douglas's motion is replete with evidence of his truly superb rehabilitation and demonstrates that he does not currently pose a danger to the community.   Any concerns over Douglas's potential future dangerousness can be allayed by the imposition of an extended period of supervised release.  See, e.g., United States v. Turner, 2020 WL 7397016, at *2 (W.D. Wash. Dec. 17, 2020) ("To alleviate fears about defendant's potential future dangerousness and to avoid disparity in sentences for similar crimes, the remaining unserved portion of defendant's term of imprisonment shall be served on supervised release." (citing 18 U.S.C. § 3582(c)(1)(A)).

## III.    Section 3553(a) Factors

The Court looks finally to the applicable § 3553(a) factors to decide whether it is "necessary to maintain the prior term of imprisonment despite the extraordinary and compelling reasons [for granting release] . . . in order to achieve the purposes of punishment that compelled the court to impose the original term of imprisonment."  See United States v. Johnson, 464 F. Supp. 3d 22, 30 (D.D.C. 2020).  The government states that the "applicable" factors are "the need for the

sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct." Gov't's Opp'n at 23. But the only specific argument the government puts forward as to why these factors necessitate Douglas's continued incarceration boils down to its assertion, backed up by a string of cases, that relief should be denied to defendants who "have served less than half of their sentences and who have such a history of violent crime, because doing so would not promote respect for the law." Gov't's Opp'n at 26–27 (collecting cases).[7]  In so arguing, the government assumes that the Court should treat Douglas's ten-year sentence as a unique and independent sentence running from his transfer to BOP on August 10, 2017, for which he has now served approximately forty-one months (or almost fifty months including credit for time previously served). Id.  Douglas, on the other hand, insists that the Court should consider "the absolute amount of time [he] has spent in prison" rather than just the portion he has served of his ten-year sentence for the Morrisey murder. Def.'s Mot. at 33.

Ultimately, the question for the Court is not simply one of numbers and percentages. Surely the government is correct when it observes that "courts have repeatedly been reluctant to release defendants" who have served less than half of their sentences for violent crimes.  See Gov't's Opp'n at 26. But this pattern reflects the fact that most sentences are imposed and begun in relatively close temporal proximity to the commission of the underlying offense, requiring a substantial period of incarceration thereafter to ensure that the offender is justly punished, is incapacitated from committing further crimes, accesses the educational and vocational training in

---

[7] The Court acknowledges that Mr. Morrisey's sister opposes Douglas's release.  See Gov't's Opp'n at 3 n.2, 26.  Although § 3553(a) does not specifically refer to victim impact, the Court implicitly factors victim impact into its consideration of the "nature and circumstances of the offense" and the need to "provide just punishment for the offense."  18 U.S.C. § 3553(a)(1) & (2)(A).  As discussed, on balance these factors do not outweigh the extraordinary and compelling circumstances justifying release.

prison necessary to successfully re-enter society, and serves as a deterrent example against criminal conduct.  See 18 U.S.C. § 3553(a)(2).  If a person convicted of a violent crime seeks release from incarceration too close in time to his criminal conduct, a court may logically conclude that insufficient time has passed to ensure the sentencing objectives of § 3553(a) are met.

An examination of the caselaw cited by the government bears this point out.  See, e.g., United States v. Barnes, Case No. 3:10-cr-32, 2020 WL 6751595, at *3 (W.D. Va. Sept. 2, 2020) (denying relief after nine years of incarceration where "Defendant's crimes and criminal history show that his continued incarceration is necessary to 'protect the public,' given his disregard for the law" (citing 18 U.S.C. § 3553(a)(2)(C)); United States v. Davies, 17-CR-57 (ERK), 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020) (releasing defendant who served only three years and three months of an eight-year sentence for "an 'abhorrent' and violent crime . . . would make a mockery of" the § 3553(a) factors including protecting the public from harm); United States v. Webster, Crim. No. 3:91cr138 (DJN), — F. Supp. 3d —, 2020 WL 618828, at *6–7 (E.D. Va. Feb. 10, 2020) (denying release where, despite having spent decades in prison, defendant "presented no post-sentencing mitigation evidence that would rebut the significant amount of evidence that demonstrates his violent nature" so "continued incarceration protects the public from further crimes that he may commit"); United States v. Esparza, No. 1:16-cr-00122-DAD-BAM, 2020 WL 4805055, at *6–7 (E.D. Cal. Aug. 18, 2020) (noting that less than a year of a 120-month sentence was insufficient for defendant to complete recommended drug treatment program and establish rehabilitation).[8]  Likewise, this Court's consideration of the § 3553(a) factors must be substantive

---

[8] Still other cases cited by the government did not rely on the § 3553(a) factors in denying relief and thus cannot bear against Douglas's motion here.  See, e.g., United States v. Brooks, Crim. No. 18-29 (JEB), 2020 WL 7186157, at *3 (D.D.C. Dec. 7, 2020) (defendant's medical conditions did not satisfy "extraordinary and compelling" standard obviating need for § 3553(a) analysis after defendant served less than three years of a ten-year sentence); United States v. McNeil, Case No. 01-80361, 2020 WL 3428973, at *1 (E.D. Mich. June 23, 2020) (no § 3553(a) analysis where defendant's claim based on First Step Act statutory changes to sentencing scheme did not constitute

and individualized, not formalistic.  Nor can this Court's discretion to reduce Douglas's sentence be hamstrung by the fact that no case exists with the same unusual set of facts.

The long gap in time between the 1990 murder of Anthony Morrisey and the present motion sets this case apart from the norm.  Douglas spent all of the intervening thirty years incarcerated except for the fateful six-month period from July 1992 through January 1993.  The Court cannot thus view Douglas's motion as though Douglas committed a murder in 2017 and was sentenced to ten years imprisonment at that time.  Nor can it view his motion through the same lens it applied at sentencing in 2012 in this case.  As the government points out, the Court was already aware that Douglas was on a positive trajectory toward rehabilitation, and it knew that his ten-year sentence would not begin to run until at least 2017 after a substantial period of incarceration in New York State.  Instead, the Court must consider the § 3553(a) factors taking into account the extraordinary and compelling circumstances to release Douglas now which did not exist at the time of sentencing, as well as any other new evidence before the Court at this time to determine whether, after all, a reduction in sentence would be unjustifiably lenient.  See Johnson, 464 F. Supp. 3d at 30 (noting that courts already apply the § 3553(a) factors at sentencing, so the compassionate release statute "requires a reconsideration of [the] same set of [§ 3553(a)] factors when deciding whether or not to modify the original sentence when there are extraordinary and compelling reasons to do so" (emphasis added)).

The Court has undertaken such an assessment here and concludes that the § 3553(a) factors do not override Douglas's medical interest in avoiding the potentially fatal consequences of COVID-19 if left to contend with the growing outbreak at FCI Ray Brook.  In addition to the

---

extraordinary and compelling circumstances); see also United States v. Parmar, 18 CR 877 (VB), 2020 WL 3640583, at *2 (S.D.N.Y. July 6, 2020) (finding defendant who had served only eleven months following a 2018 kidnapping failed to demonstrate extraordinary and compelling reasons to reduce sentence, while also noting § 3553(a) factors "weigh strongly against [defendant's] early release").

deadly serious implications of the outbreak in light of Douglas's worsening health conditions, certain other new circumstances also inform the Court's analysis.

For one, the evidence of rehabilitation presented with Douglas's motion is considerably more robust than what was presented in 2012.  As the Supreme Court has recognized, "evidence of postsentencing rehabilitation may be <u>highly</u> relevant to <u>several</u> of the § 3553(a) factors." <u>Pepper</u>, 562 U.S. at 491 (emphasis added).  The Court has already discussed at length the impressive extent to which Douglas has continued to rehabilitate and avail himself of helpful programming in mitigating any danger he might possibly pose to public safety.  <u>See</u> 18 U.S.C. § 3553(a)(1), (2)(C) & (D).

Moreover, since 2012, Douglas has taken on new responsibilities as a father to his son Anton, which factor into the Court's consideration of his "history and characteristics" alongside the nature of the underlying offense under § 3553(a)(1).  Anton submitted a letter detailing how meeting Douglas for the first time in 2017 transformed his previously "lost, confused and wondering" outlook on life, especially after Anton became a father himself in 2018.  <u>See</u> Sept. Mot. Ex. E at 7.

Douglas's violent and traumatic youth culminated in his killing two other young men by age twenty-two, costing him thirty years of his life to incarceration.  As discussed above, although the nature of the offense weighs strongly against Douglas, his "history and characteristics" including his conduct while incarcerated support release.  <u>See</u> <u>Pepper</u>, 562 U.S. at 491.  Although some four years remain to be served under his current sentence, Douglas's cumulative thirty-years of imprisonment have "'consumed a large part of [his] life and by any measure represent[] a very substantial punishment that reflects the seriousness of his offenses and the need for general or specific deterrence.'"  <u>Parker</u>, 461 F. Supp. 3d at 983 (citing <u>United States v. Redd</u>, 444 F. Supp.

3d 717, 727 (E.D. Va. 2020)).  Indeed, to subject Douglas to continued incarceration amidst an outbreak of a deadly pandemic may well increase his punishment beyond what is "sufficient, but not greater than necessary" to comply with the § 3553(a) factors.  Not only will he risk serious illness or death if infected, he will be forced to deal with the constant psychological stress of living through an outbreak knowing his own vulnerability to the virus in an environment where infection control is nearly impossible.  See Salvagno, 456 F. Supp. 3d at 426 ("Prisons are 'powder kegs for infection' and have allowed 'the COVID-19 virus [to] spread[ ] with uncommon and frightening speed.'" (quoting United States v. Skelos, No. 15-CR-317, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)).  This heightened level of punishment is not commensurate with the Court's expectation in 2012 that Douglas would be released from incarceration in his mid- to late-fifties.  See Gov't's Opp'n Ex. 2 at 16; see also Rodriguez, 2020 WL 5810161, at *3 ("[T]he actual severity of [defendant's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing." (quoting United States v. Mel, No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020)).

As indicated by the paucity of specifics in the government's argumentation under § 3553(a), the only question remaining is whether releasing Douglas after serving just over four years of his ten-year sentence would undermine respect for the law.  The Court concludes that imposing a formalistic quantitative frame on this query would be arbitrary and contrary to the purpose of the First Step Act in light of the circumstances justifying release here.  See Johnson, 464 F. Supp. 3d at 25 ("One key aspect of the [First Step Act] expands the authority of federal sentencing courts to revisit, and reduce, a previously imposed term of imprisonment" when analyzing compassionate release motions (citing First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018)).

Federal courts have granted relief to defendants with lengthy portions of their sentences remaining unserved, including in cases like Douglas's where a consecutive federal sentence has begun more recently following a more substantial state sentence.  For example, in United States v. Redwine, the U.S. District Court for the Eastern District of Virginia released a man convicted of several armed bank robberies in 1988 "roughly eight months" into his twenty-five year federal consecutive sentence after he was granted parole in Virginia where he served approximately thirty-three years in state prison.  See Crim. No. 3:87cr70, 2020 WL 6829848, at *3 (E.D. Va. Nov. 20, 2020).  Other courts have reduced even life without parole sentences doled out for heinous and repeated criminal conduct, including multiple killings, where extraordinary and compelling circumstances have been found to justify release.  See, e.g., United States v. Tidwell, Crim. Action No. 94-353, — F. Supp. 3d —, 2020 WL 4504448, at *1 (E.D. Pa. Aug. 5, 2020) (reducing life without parole to time served after twenty-seven years for man convicted of two counts of murder among other conspiracy, drug, and weapons offenses); Rodriguez, 2020 WL 5810161, at *1 (reducing life without parole to thirty years for man convicted of torturing and executing government witness among other conspiracy and racketeering offenses); see also United States v. Wildcat, Case No. 4:99-cr-00002-BLW, 2020 WL 7872509, at *1 (D. Idaho Dec. 31, 2020) (reducing thirty-year sentence to time served after approximately 262 months for man convicted of two counts of second-degree murder).

Douglas has grave medical concerns amidst conditions at FCI Ray Brook "that are relatively dire among federal prisons," so "'[a]lthough [his] original release date may be far off, the threat of COVID-19 is at his doorstep.'"  Salvagno, 456 F. Supp. 3d at 429 (quoting United States v. Zukerman, 451 F. Supp. 3d 329, 334 (S.D.N.Y. 2020)).  Douglas has shown through his conduct while incarcerated that he is prepared to reenter society with an abiding and infectious

respect for the law which he has already passed on to younger inmates, and which the Court hopes he will continue to pass on to younger generations in his own family and the community at large.

The Court will impose conditions upon Douglas's release to safeguard against any lingering risk of recidivism and conform his reduced sentence to the factors discussed above. As imposed in Douglas's initial sentence under his plea agreement, he will continue to be subject to sixty months' probation. Further, in consideration of the seriousness of the underlying offense and the substantial portion of his original sentence yet to be served, Douglas will be confined to his home for nine months after his release as a condition of probation. The Court believes that this sentence, which spares Douglas from continued exposure to the precarious conditions at FCI Ray Brook, will be "sufficient, but not greater than necessary" to achieve the statutory objectives of sentencing.

## Conclusion

For the foregoing reasons, the Court finds that Douglas's medical conditions rendering him vulnerable to serious illness or death if infected with COVID-19, amidst the current outbreak of the virus at FCI Ray Brook, constitute extraordinary and compelling circumstances justifying release. It further finds that release is consistent with the applicable factors set forth in 18 U.S.C. § 3553(a) and will not pose a danger to public safety. Accordingly, the Court will grant Douglas's motion for compassionate release. The unsuspended portion of his sentence will be reduced to time served, followed by the sixty-month term of probation set forth in the original Judgment. As a further condition of probation, Douglas will spend 270 days in home confinement. A separate Order will be issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: January 20, 2021